## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

-------------------------------------------------------------x

In re:                                                 :   Chapter 11
                                                       :
Allied Systems Holdings, Inc. *et al*,[1]              :
                                                       :   Case No.: 12-11564 (CSS)
                   Debtors.                            :   (Jointly Administered)

-------------------------------------------------------------x

BDCM Opportunity Fund II, LP, Black Diamond    :
CLO 2005-1 Ltd., and Spectrum Investment       :
Partners, L.P.,                                :   Adversary Proceeding No.
                                               :
                   Plaintiff(s),               :
                                               :
                   - against -                 :
                                               :
Yucaipa American Alliance Fund, I, LP, Yucaipa :
American Alliance (Parallel) Fund I, L.P., Yucaipa :
American Alliance Fund, II, LP, Yucaipa        :
American Alliance (Parallel) Fund II, L.P., Ronald :
Burkle, Derex Walker, Ira Tochner, Jeff Pelletier, :
Jos Opdeweegh, Joseph Tomczak, and Mark        :
Gendregske,                                    :
                                               :
                   Defendants.                 :
                                               :
                                               :

-------------------------------------------------------------x

## COMPLAINT FOR (I) EQUITABLE SUBORDINATION OF CLAIMS AGAINST THE YUCAIPA DEFENDANTS, (II) SPECIFIC PERFORMANCE AGAINST THE YUCAIPA DEFENDANTS, (III) BREACH OF CONTRACT AGAINST THE YUCAIPA DEFENDANTS, (IV) BREACH OF FIDUCIARY DUTY AGAINST THE YUCAIPA DIRECTORS, AND (V) AIDING AND ABETTING BREACH OF FIDUCIARY DUTY AGAINST BURKLE AND THE YUCAIPA DEFENDANTS

Plaintiffs BDCM Opportunity Fund II, LP, Black Diamond CLO 2005-1 Ltd., and

---

[1] The "Debtors" in these cases, along with the federal tax identification number (or Canadian business number where applicable) for each of the Debtors, are: Allied Systems Holdings, Inc. (58-0360550); Allied Automotive Group, Inc. (58-2201081); Allied Freight Broker LLC (59-2876864); Allied Systems (Canada) Company (90-0169283); Allied Systems, Ltd. (L.P.) (58-1710028); Axis Areta. LLC (45-5215545); Axis Canada Company (875688228); Axis Group, Inc. (58-2204628); Commercial Carriers, Inc. (38-0436930); CT Services. Inc. (38-2918187); Cordin Transport LLC (38-1985795); F.J. Boutell Driveaway LLC (38-0365100); GACS Incorporated (58-1944786); Logistic Systems. LLC (45-4241751); Logistic Technology, LLC (45-4242057): QAT, Inc. (59-2876863): RMX LLC (31-0961359); Transport Support LLC (38-2349563); and Terminal Services LLC (91-0847582).

Spectrum Investment Partners, L.P. (the "Plaintiffs"), bring this action:

(i) under 11 U.S.C. § 510(c) to subordinate, for purposes of distribution, the claims held by Yucaipa American Alliance Fund, I, LP, Yucaipa American Alliance (Parallel) Fund I, L.P., Yucaipa American Alliance Fund, II, LP, and/or Yucaipa American Alliance (Parallel) Fund II, L.P. (collectively, "Yucaipa" or "Yucaipa Defendants")[2] pursuant to the First Lien Credit Agreement[2] and the Second Lien Credit Agreement,[3] to the claims of all other First Lien Lenders and Second Lien Lenders,[4]

(ii) for specific performance against the Yucaipa Defendants based upon the Yucaipa Defendants failure to comply with the terms of the First Lien Credit Agreement, including (without limitation) Section 10.6(c) and Sections 10.6(j)(iii) and (iv) (as amended through the Third Amendment),

(iii) for breach of contract against the Yucaipa Defendants based on the Yucaipa Defendants failure to comply with the terms of the First Lien Credit Agreement, including (without limitation) Section 10.6(j)(iii) thereof (as amended through the Third Amendment),[5]

(iv) for damages against Derex Walker, Ira Tochner, Jeff Pelletier, Jos Opedeweegh, Joseph Tomczak and Mark Gendregske (the "Yucaipa Directors") for breach of fiduciary duties as directors of Allied Systems Holdings, Inc. and certain of the other Debtors, and

(v) for damages against Ronald Burkle ("Burkle") and the Yucaipa Defendants for aiding and abetting breach of the Yucaipa Directors' fiduciary duties.

---

[2] "First Lien Credit Agreement" means that certain Amended and Restated First Lien Secured Super-Priority Debtor in Possession and Exit Credit Agreement and Guaranty Agreement, dated May 15, 2007, between Allied Systems Holdings Inc. and Allied Systems Ltd. (L.P.), as Borrowers", the Lenders from time to time party thereto, and The CIT Group Business Credit, Inc. ("CIT"), as Administrative Agent and Collateral Agent (as amended, modified or supplemented from time to time through and including that certain Amendment No. 3 to Credit Agreement and Consent, dated as of April 17, 2008). All capitalized terms used herein and not otherwise defined shall have the meanings set forth in the First Lien Credit Agreement.

[3] "Second Lien Credit Agreement" means that certain Second Lien Secured Super-Priority Debtor in Possession and Exit Credit and Guaranty Agreement dated as of May 15, 2007 among Allied Systems Holdings Inc. and Allied Systems Ltd. (L.P.), as Borrowers, Certain Subsidiaries of the Borrowers as Guarantors, Various Lenders and Goldman Sachs Credit Partners L.P. as Lead Arranger and Syndication Agent, Administrative Agent and Collateral Agent ((as amended, modified or supplemented from time to time).

[4] "First Lien Lenders" means the Lenders from time to time party to the First Lien Credit Agreement. "Second Lien Lenders" means the Lenders from time to time party to the Second Lien Credit Agreement.

[5] "Third Amendment" means Amendment No. 3 to the First Lien Credit Agreement, dated April 17, 2008, between Allied Systems Holdings Inc. and Allied Systems Ltd. (L.P.), as Borrowers and CIT.

## NATURE OF THE COMPLAINT

1.      This case arises out of a highly choreographed scheme by Yucaipa, the Yucaipa Directors and, upon information and belief, Burkle, implemented over the course of several years, to advance the investment interests of Yucaipa to the detriment of the Plaintiffs and the other First Lien Lenders.  In furtherance of this scheme, Yucaipa -- as the controlling shareholder of the Debtors and acting through its hand-picked Board of Directors[6] – engaged in a course of conduct designed to frustrate the exercise of the legitimate rights and remedies of Plaintiffs and the other First Lien Lenders after numerous Events of Default had admittedly occurred and were continuing, and at a time when the Debtors were insolvent.  Yucaipa, the Yucaipa Directors and Burkle have (i) engaged in a pattern of inequitable conduct against the Plaintiffs and the other First Lien Lenders, (ii) conferred (and/or took actions in an effort to confer) an unfair advantage on Yucaipa; and (iii) caused damages to the Plaintiffs and the other First Lien Lenders.

2.      The lynchpin of Yucaipa's scheme was Yucaipa's illegitimate and improper assertion that it is/was the controlling or "Requisite Lender" under the First Lien Credit Agreement.  Had that been the case, Yucaipa would have had dictatorial powers as a result of its ability to control both the Debtors (through its majority equity ownership and the Yucaipa Directors) *and* the exercise (or forbearance from exercise) of the rights and remedies of the Debtors' First Lien Lenders.  However, as discussed more fully below, the Supreme Court of the State of New York (the "New York Court") recently ruled, unequivocally, that Yucaipa is not and never was the "Requisite Lender" under the First Lien Credit Agreement.  The improper and self-interested actions taken by Yucaipa, the Yucaipa Directors and, upon information and belief,

---

[6] Upon information and belief, Derex Walker (the Chairman of the Allied Board) and Ira Tochner (also a director) are employees or principals of Yucaipa and/or its affiliates, and are responsible for managing Yucaipa's debt and equity investments in the Debtors.

Burkle, to manipulate and control the Debtors during the more than three year period preceding the New York Court's ruling, caused substantial harm to the Plaintiffs and the other First Lien Lenders, warranting subordination of Yucaipa's claims to the claims of all other First Lien Lenders and Second Lien Lenders, and the award of damages against the Yucaipa Directors and Burkle.

3.     The goal of the scheme by Yucaipa, the Yucaipa Directors and, upon information and belief, Burkle, was to control every aspect of the Debtors' capital structure, and neutralize the legal rights of Plaintiffs and other First Lien Lenders, so that Yucaipa and the Yucaipa Directors could control Allied for the benefit of Yucaipa and to the detriment of Plaintiffs and each other First Lien Lender.  Upon information and belief, at the direction of Burkle, in August 2009, Yucaipa, which by then already controlled the Debtors through (i) ownership of a majority of the Debtors' equity interests, (ii) its appointment of the majority of the Debtor's Board of Directors (the "Board"), and (iii) its control of Allied's management, consummated in a highly choreographed series of events to hijack control of the First Lien Credit Agreement and declare itself the "Requisite Lender" thereunder.

4.     The First Lien Credit Agreement vests the Requisite Lenders with broad authority to make key decisions affecting the rights of all First Lien Lenders. In addition, the Requisite Lenders are vested with the authority to direct the Administrative Agent to exercise certain rights and remedies on behalf of all First Lien Lenders, such as declaring Events of Default, demanding immediate payment by Borrowers of any and all amounts due, or commencing foreclosure on the collateral pledged to secure the Obligations.  Significantly, in addition to the right to direct the Administrative Agent to exercise remedies on behalf of all First

Lien Lenders, Requisite Lenders also have the power to direct the Administrative Agent to refrain from exercising such remedies.

5.      Given the manifest conflict of interest that would arise if Yucaipa – as controlling and majority shareholder of Allied – were able to control the exercise of the First Lien Lenders' rights and remedies under the First Lien Credit Agreement, and thereby protect and benefit itself as equity owner, the First Lien Credit Agreement was initially drafted to absolutely prohibit Yucaipa from becoming a First Lien Lender (thus foreclosing any possibility that Yucaipa could become Requisite Lender).  Under the Third Amendment, however, Yucaipa was permitted to acquire a certain limited amount of Term Loans, but only subject to substantial restrictions that, among other things, required Yucaipa to contribute to capital fifty (50%) of the Term Loans it acquired, and precluded Yucaipa from becoming the Requisite Lender or voting on any matter that could affect in any way the rights and remedies of the First Lien Lenders.

6.      Given the occurrence and continuance of Events of Default (including payment Defaults), and with the First Lien Lenders beginning to exert pressure on the Debtors (including the possible acceleration of the Obligations, which would have precipitated the commencement of chapter 11 cases), Yucaipa determined that it had to become the Requisite Lender to stop any possible exercise of remedies by the First Lien Lenders.  Knowing that it could not achieve that objective with the restrictions contained in the Third Amendment in place, Yucaipa attempted in February 2009 to become the Requisite Lender by tendering for the Obligations under the First Lien Credit Agreement.  As a condition to the tender, any tendering First Lien Lender would have to execute an amendment to the First Lien Credit Agreement eliminating all of the restrictions imposed by the Third Amendment on Yucaipa's ownership of Obligations.  Yucaipa admits that the form of the amendment for which it sought approval was in

all material respects identical to the Purported Fourth Amendment (described below), which approval Yucaipa, the Yucaipa Directors and, upon information and belief, Burkle, engineered several months later. Yucaipa's tender failed miserably.

7.      Upon information and belief, by December 2008 ComVest Investment Partners III, L.P. ("ComVest") had either acquired, or had committed to acquire, a majority of the Obligations under the First Lien Credit Agreement.   By February 2009, ComVest had become the Requisite Lender.  Upon information and belief, ComVest was pressing Yucaipa and the Yucaipa Directors to address the Events of Default under the First Lien Credit Agreement through a restructuring of the Debtors that would eliminate (or substantially dilute) Yucaipa's equity interest.  Yucaipa, the Yucaipa Directors and, upon information and belief Burkle, would have none of it.  Instead, despite the occurrence and continuance of Events of Default, Yucaipa and the Yucaipa Directors refused to pursue any restructuring, and held ComVest at bay while at the same time Yucaipa was negotiating to purchase the Obligations held by ComVest for the purpose of becoming Requisite Lender.  After months of futile efforts to pursue an appropriate restructuring of the Debtors for the benefit of all First Lien Lenders, ComVest finally acceded and agreed to sell their Obligations to Yucaipa.

8.      On August 21, 2009, in furtherance of its scheme to usurp control of every level of the Debtors' capital structure, Yucaipa, the Yucaipa Directors and, upon information and belief, Burkle, caused Allied to enter into a "Purported Fourth Amendment" to the First Lien Credit Agreement.  The only First Lien Lender who signed the Purported Fourth Amendment was ComVest; no other First Lien Lender was even solicited.  The sole purpose and effect of the Purported Fourth Amendment was to remove all of the restrictions imposed on Yucaipa's acquisition, ownership and voting of Obligations under the First Lien Credit Agreement and the

Third Amendment, thereby making Yucaipa eligible to be the Requisite Lender.  On the same day as Yucaipa, the Yucaipa Directors and Burkle caused Allied to enter into the Purported Fourth Amendment, Yucaipa purchased all of the Obligations under the First Lien Credit Agreement owned by ComVest.[7]  Yucaipa's ability to completely dominate and control the Allied capital structure (through a combination of the Yucaipa Directors' control of the Board and its alleged status as Requisite Lender) and to insulate itself from the legitimate exercise of rights and remedies by Plaintiffs and the other First Lien Lenders was now (presumably) complete.[8]

        9.      The Purported Fourth Amendment and Yucaipa's purchase of ComVest's Obligations afforded Yucaipa and Burkle their stated purpose -- the ability to simultaneously control the (a) Debtors, through Yucaipa's majority equity position and control of the Board, and (b) the First Lien Lenders, through Yucaipa's alleged Requisite Lender position.  Yucaipa, the Yucaipa Directors and, upon information and belief, Burkle, exercised this dominion and control for more than three (3) years, and used millions of dollars of corporate assets to fund litigation defending Yucaipa's alleged Requisite Lender status.  And while Yucaipa reigned as the alleged Requisite Lender (in conjunction with its control of the Board), the Events of Default continued to the point where the Debtors missed principal and interest payments exceeding tens of millions of dollars.  The Debtors' business operations also withered under a mountain of crushing debt which impaired the Debtors' ability to attract new business and invest sorely needed capital. Yucaipa, however, exercised its alleged position as Requisite Lender and its control over the

---

[7] Upon information and belief, in exchange for the acquisition of the Obligations owned by ComVest, Yucaipa agreed to (a) pay for ComVest an amount in cash, and (b) provide ComVest with a portion of any profit Yucaipa received on such Obligations.

[8] Yucaipa has admitted that it would not have purchased any First Lien Debt from ComVest if it had known that Yucaipa "could be subject to the decisions of other Lenders." *See* Yucaipa Answer and Counterclaims, at par. 18. Thus, the objective of Yucaipa's scheme, by its own admission, was to become the Requisite Lender and to control the entirety of the Debtors' capital structure.

Board to preclude any exercise of rights or remedies by the Agent or the First Lien Lenders, or any restructuring that would have allowed the other First Lien Lenders to recover on the Obligations they held under the First Lien Credit Agreement. Yucaipa hid the Debtors' poor financial condition by intentionally causing the Debtor to withhold financial information it was obligated to provide under the First Lien Credit Agreement from other First Lien Lenders.

10.    On November 19, 2012, in an action commenced in the New York Court by Plaintiffs against Yucaipa challenging the Purported Fourth Amendment and Yucaipa's alleged status as Requisite Lender, the New York court granted Plaintiff's motion for summary judgment, ruling that Yucaipa is not and never has been the Requisite Lender. *BDCM Opportunity Fund II, LP et al. v. Yucaipa American Alliance Fund I L.P. et al, Index No. 650150/2012* (the "New York Action"). That ruling laid bare the falsity of the pretext upon which Yucaipa had been holding hostage Plaintiffs and the other First Lien Lenders for more than three (3) years.

11.    Prior to that ruling, Yucaipa, the Yucaipa Directors and, upon information and belief, Burkle, exercising dictatorial powers as the controlling shareholder and alleged Requisite Lender, caused the Debtors to, among other things, (i) default on numerous provisions of the First Lien Credit Agreement and other agreements, including failure to pay interest and principal to the First Lien Lenders; and (ii) engage in corporate waste and misappropriate assets in favor of Yucaipa, while at the same time precluding Plaintiffs and the other First Lien Lenders from exercising legitimate rights and remedies as First Lien Lenders, all for the benefit of Yucaipa and to the detriment of Plaintiffs and all other First Lien Lenders. Upon information and belief, and as further detailed below, Yucaipa, and the Yucaipa Directors, who, upon information and belief, acted at the direction of Burkle, also usurped from the Debtors a pre-

petition corporate opportunity with a potential strategic buyer in an effort to allow Yucaipa to recover more on account of the Obligations it allegedly owned under the First Lien Credit Agreement than Plaintiffs or any other First Lien Lender. These and other actions to be detailed at trial harmed Plaintiffs and the other First Lien Lenders warranting subordination of Yucaipa's claims.

12.    This Complaint also seeks redress for the egregious breaches of fiduciary duty by the Yucaipa Directors. Upon information and belief, Allied was insolvent as early as July 2008. As a result, the Yucaipa Directors owed fiduciary duties to the Debtors' creditors. The Yucaipa Directors breached these fiduciary duties by their abject failure to develop, manage, or oversee a restructuring or sale process despite numerous admitted Events of Default under the First Lien Credit Agreement and continuous, substantial operating losses. In addition, the Yucaipa Directors acted solely in furtherance of Yucaipa's interests, consistently placing those interests ahead of the interests of the Plaintiffs and the other First Lien Lenders. The failures of the Yucaipa Directors were avoidable and directly resulted in harm to Plaintiffs through, among other things, the precipitous decline in the value of Debtors' assets and enterprise value (which constitute the collateral for the Obligations).[9]

13.    Yucaipa and, upon information and belief, Burkle, knowingly participated in and induced all of the breaches of fiduciary duty by the Yucaipa Directors to the Debtors and such breaches were on account of, or for the direct benefit of Burkle, and Yucaipa.

14.    Finally, the Plaintiffs seek redress for Yucaipa's breach of the First Lien Credit Agreement and the Third Amendment by failing to make the mandatory capital contribution to the Debtors' estate of "no less than 50% of the aggregate principal amount" of the

---

[9] The Debtors' certificates of incorporation contain certain exculpatory provisions that are apparently intended to eliminate personal liability of its directors and officers for breaches of their fiduciary duties. However, such exculpatory provisions are not applicable under Delaware law.

Term Loans purchased by Yucaipa, as required by the Third Amendment to the First Lien Credit Agreement.    Yucaipa alleges that it acquired from ComVest Term Loans aggregating $114,712,088.66.    Thus, under the Third Amendment Yucaipa is obligated to contribute to capital $57,356,044.30 of such Term Loans. Further, under the Third Amendment, Yucaipa is not permitted to acquire more than $50 million of the principal amount of any Term Loans or any LC Commitments.    Thus, Yucaipa must divest itself of all LC Commitments and any Term Loans held in excess of $25 million (i.e. the maximum amount of Term Loans Yucaipa was permitted to hold after giving effect to the mandatory capital contribution).

## PARTIES

15.    Plaintiff BDCM Opportunity Fund II, LP is a Delaware limited partnership, with its principal place of business at One Sound Shore Drive, Suite 200, Greenwich, CT 06830.

16.    Plaintiff Black Diamond CLO 2005-1 Ltd. is a Cayman Islands limited liability company, with its principal place of business at One Sound Shore Drive, Suite 200, Greenwich CT 06830.

17.    Plaintiff Spectrum Investment Partners, L.P. is a Delaware limited partnership, with its principal place of business at 1250 Broadway, New York, NY 10001.

18.    Defendant Yucaipa American Alliance Fund, I, LP is a Delaware limited partnership with its principal place of business at 9130 West Sunset Boulevard, Los Angeles, California, 90069.    Upon information and belief, Yucaipa American Alliance Fund, I, LP is a 37.24% (approximate) shareholder of Allied Systems Holdings, Inc.

19.    Defendant Yucaipa American Alliance (Parallel) Fund II, LP is a Delaware limited partnership with its principal place of business at 9130 West Sunset Boulevard,

Los Angeles, California, 90069.  Upon information and belief, Yucaipa American Alliance (Parallel) Fund I, LP is a 26.10% (approximate) shareholder of Allied Systems Holdings, Inc.

20.    Defendant Yucaipa American Alliance Fund, II, LP is a Delaware limited partnership with its principal place of business at 9130 West Sunset Boulevard, Los Angeles, California, 90069.

21.    Defendant Yucaipa American Alliance (Parallel) Fund II, LP is a Delaware limited partnership with its principal place of business at 9130 West Sunset Boulevard, Los Angeles, California, 90069.

22.    Defendant Ronald Burkle, an individual, upon information and belief, is the founder and Managing Partner of The Yucaipa Companies LLC, a private investment firm and, upon information and belief, at all relevant times, controlled the actions of Yucaipa and the Yucaipa Directors.

23.    Defendant Derex Walker is an individual who served as a director of and Chairman of the Board of Allied during the relevant time period herein.  Upon information and belief, Defendant Walker, at all relevant times herein, was affiliated with Yucaipa or The Yucaipa Companies LLC and, acted in his capacity as an Allied Director,  at the direction of and for the benefit of Burkle and Yucaipa.

24.    Defendant Ira Tochner is an individual who served as a director of Allied during the relevant time period herein.  Upon information and belief, Defendant Tochner, at all relevant times herein, was affiliated with Yucaipa or The Yucaipa Companies LLC and, acted in his capacity as an Allied Director, at the direction of and for the benefit of Burkle and Yucaipa.

25.    Defendant Jeff Pelletier is an individual who served as a director of Allied during the relevant time period herein.  Upon information and belief, Defendant Pelletier, at all

relevant times herein, was affiliated with Yucaipa or The Yucaipa Companies LLC and, acted in his capacity as an Allied Director, at the direction of and for the benefit of Burkle and Yucaipa.

26.     Defendant Jos Opdeweegh is an individual who served as a director of Allied during the relevant time period herein.  Upon information and belief, Defendant Opdeweegh, at all relevant times herein, was affiliated with Yucaipa or The Yucaipa Companies LLC and, acted in his capacity as an Allied Director, at the direction of and for the benefit of Burkle and Yucaipa.

27.     Defendant Joseph Tomczak is an individual who served as an officer and upon information and belief, a director of Allied during the relevant time period herein.  Upon information and belief, Defendant Tomczak, at all relevant times herein, was affiliated with Yucaipa or The Yucaipa Companies LLC and, acted in his capacity as an Allied Director, at the direction of and for the benefit of Burkle and Yucaipa.

28.     Defendant Mark Gendregske is an individual who served as Chief Executive Officer and upon information and belief, a director of Allied during the relevant time period herein.  Upon information and belief, Defendant Gendregske was appointed as a director by Yucaipa and Burkle, and at all relevant times acted in his capacity as an Allied Director, at the direction of and for the benefit of Burkle and Yucaipa.

## JURISDICTION/VENUE

29.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1334(b) because this proceeding arises under or in a case under the Bankruptcy Code ("Code"), Title 11 of the United States Code.

30.     This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

31.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## FACTS

32.     The Debtors are providers of distribution and transportation services to the automotive industry, specializing in the delivery of new vehicles from auto manufacturing plants to auto dealerships.  The Debtors and several related entities filed for Chapter 11 bankruptcy protection once before,  in July 2005 (the "Prior Bankruptcy Cases").

**Yucaipa's Control of the Debtors' Business**

33.     In May 2007, the Debtors' plan of reorganization in the Prior Bankruptcy Cases became effective resulting in Yucaipa becoming the majority and controlling shareholder of the Allied Systems Holdings, Inc.  Upon information and belief, as a result of the plan in the Prior Bankruptcy Cases, Yucaipa owned or controlled more than 70% of the common equity of the Debtors.  Since Allied's emergence from the Prior Bankruptcy Cases, Yucaipa has used (and continues to use) this controlling interest to operate the Debtors for its own benefit.

34.     In addition to, and as a result of, their majority ownership interest in the Debtors, Yucaipa controls the Debtors' Board.   Pursuant to the Debtors' 2007 plan of reorganization, Yucaipa appointed four out of the five members of the Debtors' Board, all of whom were either employees of, or affiliated with, or under the dominion  and control of Yucaipa.[10]

35.     Yucaipa's control over the Board has enabled it to at all relevant times control the Debtors, including appointing members of senior management of the Debtors and controlling their actions.

---

[10] The initial appointees to the Board were Brian Culllen, and Defendants Gendregske, Opdeweegh, Tochner and Walker.  Defendants Opdeweegh, Tochner and Walker were selected to serve by Yucaipa.  Upon information and belief, Defendant Tomczak served, at the direction of Yucaipa, as directors at certain times during 2008 and 2009.  Also, upon information and belief, Defendant Gendregske is under Yucaipa's control due to Yucaipa's guarantee of compensation arrangements worth millions of dollars.

**The Credit Agreements**

36.    To finance their May 2007 emergence from the Prior Bankruptcy Cases, Allied and its affiliates obtained financing through two credit facilities consisting of (a) a $265 million senior secured first priority credit facility evidenced by the First Lien Credit Agreement and (b) a $50 million second lien credit facility evidenced by the Second Lien Credit Agreement. The First Lien Credit Agreement provided for (i) term loans in the aggregate principal amount of $180 million (the "Term Loans"); (ii) a $35 million revolving credit facility from CIT (the "Revolving Loan"); and (iii) a $50 million synthetic letter of credit facility ("LC Facility").

37.    The Yucaipa Defendants are defined in the First Lien Credit Agreement as the "Sponsor" due to their sponsorship of the Debtors' 2007 plan of reorganization and subsequent control of the Debtors after its emergence from the Prior Bankruptcy Cases.

38.    Central to the First Lien Credit Agreement is the concept of the Requisite Lender(s).  As defined in the First Lien Credit Agreement, the Requisite Lenders are

> one or more Lenders having or holding Term Loan Exposure, LC Exposure and/or Revolving Exposure and representing more than 50% of the sum of (i) the aggregate Term Loan Exposure of all Lenders, (ii) the aggregate LC Exposure of all Lenders and (iii) the aggregate Revolving Exposure of all Lenders.

39.    As set forth above, the Requisite Lenders, as majority debt holders, are vested with broad authority to make key decisions affecting the rights of all First Lien Lenders, including the authority to direct the Administrative Agent to exercise or refrain from exercising certain rights and remedies on behalf of all Lenders, such as declaring Events of Default, demanding immediate payment by Allied of any and all amounts due, or commencing foreclosure on the collateral pledged to secure the Obligations.

40.     Given the manifest conflict of interest that would arise if Yucaipa – as controlling and majority shareholder of the Debtors – were able to control the exercise of the First Lien Lenders' rights and remedies under the First Lien Credit Agreement, and thereby protect and benefit itself as equity owner, the First Lien Credit Agreement was drafted to foreclose any possibility that Yucaipa could become a Requisite Lender.  Under the First Lien Credit Agreement, the only parties eligible to be a Requisite Lender are "Lenders," which consist solely of the original First Lien Lender signatories to the First Lien Credit Agreement, and Eligible Assignees who subsequently become First Lien Lenders.

41.     Yucaipa was not a First Lien Lender signatory under the First Lien Credit Agreement.  Nor could Yucaipa become a First Lien Lender through an Assignment Agreement because, pursuant to Section 10.6(c) of the First Lien Credit Agreement, First Lien Lenders were only permitted to sell, transfer or assign their rights under the First Lien Credit Agreement (*i.e.*, enter into an Assignment Agreement) to Eligible Assignees.)    The definition of Eligible Assignee expressly provides that "no ... Sponsor shall be an Eligible Assignee."[11]

**Allied's Business Falters Shortly After**
**Emergence From the Prior Bankruptcy Cases**

42.     Less than a year after their emergence from the Prior Bankruptcy Cases, the Debtors were back in financial trouble.  In the April 1, 2008 minutes of the Special Committee of the Board, Tom King, Allied's chief financial officer, reported that "the Company's lenders were nervous."  He further reported that the Company was obligated to report its first quarter financial results to the First Lien Lenders by the end of April and would likely have a "going concern problem" if a transaction then under discussion with Yucaipa were not timely

---

[11] Similar restrictions on Yucaipa existed under the initial Second Lien Credit Agreement.

concluded. Mr. King further reported that the issuance of a going concern opinion from the Company's auditors would constitute a default under the First Lien Credit Agreement.

43. The transaction then under discussion between Yucaipa and the Debtors contemplated Yucaipa's acquisition of Obligations under the First Lien Credit Agreement and the contribution of those Obligations (in the amount of approximately $20-25 million) to capital of Allied in exchange for additional equity interests. As Mr. King advised the Special Committee at the April 8, 2008 meeting, absent the transaction, the Company's only other option would be to try to meet their covenants, which would be "pathetically tight" in June. At that meeting Mr. King again expressed his concerns regarding the auditor's issuance of a qualified going concern opinion.

**Yucaipa Obtains the Right to Become a Lender**
**Under the Credit Agreement with**
**Significant Restrictions on its Rights as a Lender**

44. In or around April 2008, the First Lien Lenders were advised that Yucaipa was interested in acquiring a portion of the Obligations under the First Lien Credit Agreement (and thus becoming a First Lien Lender under the First Lien Credit Agreement) presumably for the purpose of effectuating the transaction then under discussion with the Debtors. However, due to the restrictions prohibiting Yucaipa from being an Eligible Assignee, Yucaipa could only purchase the Obligations if an amendment to the First Lien Credit Agreement were executed permitting such acquisition. As a result, Yucaipa and the Debtors requested and received consent from the First Lien Lenders to amend the First Lien Credit Agreement (pursuant to the Third Amendment dated April 17, 2008) to permit Yucaipa to become a "Lender" under

extremely limited circumstances and with severe conditions and restrictions placed on its rights in connection with the Obligations it could acquire.[12]

45.     Specifically, under the Third Amendment, Yucaipa was expressly designated a Restricted Sponsor Affiliate and was:

- Required to contribute to Allied as capital no less than 50% of the aggregate principal amount of any Term Loans that Yucaipa obtained within ten days after the date of such acquisition – **thus further minimizing the impact Yucaipa could assert through its ownership of the Term Loans.**

- Prohibited from accumulating over (i) 25% of the aggregate principal amount of the Term Loan Exposure held by all First Lien Lenders or (ii) $50 million of the principal amount of Term Loans,– **thus preventing the acquisition of the majority ownership stake required to become a Requisite Lender;** [13]

- Prohibited from exercising any and all voting rights it would otherwise have as a First Lien Lender, including the right to consent to an amendment of the First Lien Credit Agreement or the right to vote its debt in any Allied bankruptcy – **thereby precluding Yucaipa from exercising any voting rights granted to the Lenders ;**

- Prohibited from including its Term Loans in any calculation of Term Loan Exposure when such calculation was required under the First Lien Credit Agreement – **thus again precluding Yucaipa from amassing a sufficient stake to become a Requisite Lender; and**

---

[12] Simultaneously, Yucaipa and the Debtors sought and received an amendment to the Second Lien Credit Agreement to permit Yucaipa to become a "Lender" under the Second Lien Credit Agreement and to contribute a portion of any Obligations purchased to capital. Thus, on or about April 17, 2008 (the same date as the Third Amendment) the Debtors, the Second Lien Agent and Requisite Lenders under the Second Lien Credit Agreement executed that certain Amendment No. 3 to the Credit Agreement and Consent. As Yucaipa now admits, Yucaipa never had any intention of purchasing Obligations under the First Lien Credit Agreement under the terms of the Third Amendment. Rather, Yucaipa and the Yucaipa Directors deceived the First Lien Lenders into believing Yucaipa intended to acquire Obligations under the First Lien Credit Agreement so that Yucaipa could get what it really wanted, which was the amendment to the Second Lien Credit Agreement. The consents of the First Lien Lenders contained in the Third Amendment were required in order for the transactions contemplated by the amendment to the Second Lien Credit Agreement to be permitted. Having requested and negotiated the execution of the Third Amendment, there is nothing "inequitable" about requiring Yucaipa to comply with its terms.

[13] Yucaipa was also prohibited from acquiring *any* Revolving Loans or LC Deposit Loans.

46.     To ensure Yucaipa's compliance with these fundamental restrictions, the Third Amendment further <u>required</u> Allied to deliver to the Administrative Agent monthly reports of the amount of Term Loans acquired and held by Yucaipa, and the price paid for such loans.

**Allied's Financial Condition Deteriorates,**
**While Events of Default Occur and Continue**

47.     Despite the execution and delivery of the Third Amendment, Yucaipa never acquired any of the Obligations under the First Lien Credit Agreement at that time.

48.     Meanwhile, as predicted by Mr. King, Allied's financial condition continued to deteriorate.  Specifically, in August 2008, Allied notified the First Lien Lenders and the Administrative Agent that it had failed to comply with the financial covenants set forth in Sections 6.7(a) and 6.7(b) of the First Lien Credit Agreement, resulting in Events of Default under Section 8.1 of the First Lien Credit Agreement as of the fiscal quarter ended June 30, 2008.

49.     Since Allied's first default in August 2008, Allied has, all at Yucaipa's, the Yucaipa Directors' and, upon information and belief, Burkle's, direction and control, continued, on a regular basis, to default on its obligations under the First Lien Credit Agreement, resulting in a multitude of Events of Default under, and material breaches of, the First Lien Credit Agreement, including and without being exhaustive: (i) failure to comply with the financial covenants in the First Lien Credit Agreement for the past several years; (ii) failure to comply with its letter of credit obligations, by not reimbursing a collateral account when beneficiaries have drawn on those letters of credit and thereby squandering security of the First Lien Lenders; (iii) since December 2008, maintaining excess cash balances in accounts outside of control agreements, thereby securing for itself, without authorization or consent, access to cash that was supposed to be security for the First Lien

Lenders; and (iv) failure to deliver requisite financial statements and other information on a timely basis.

50.     Allied, at Yucaipa's, the Yucaipa Directors' and, upon information and belief, Burkle's, direction and control, also ceased payment of required principal and interest payments under the First Lien Credit Agreement, even though Allied had the requisite cash to make the payments.  By not making principal and interest payments — in combination with the self-help in which Allied has engaged by not reimbursing the collateral account that secures the L/C Facility, attempting to terminate control agreements without providing specified terms for new agreements and by retaining excess cash outside of controlled accounts pledged to the Lenders in contravention of the Credit Documents —Yucaipa, through the Yucaipa Directors, effectively usurped the First Lien Lenders' rights.

**Yucaipa Usurps Requisite Lender Status**

51.     In September 2008, the First Lien Lenders and the Debtors entered into a Forbearance Agreement, dated September 24, 2008, to provide for a period of negotiations on how to address the various Events of Default.  Concurrent with the execution of the Forbearance Agreement, upon information and belief, Yucaipa executed a side letter in favor of the First Lien Lenders in which Yucaipa agreed to refrain from purchasing any Obligations under the First Lien Credit Agreement (the "Side Letter").

52.     By December 2008, no agreement on a restructuring had been reached and the Forbearance Agreement and Side Letter agreements had expired.  At the December 10, 2008 meeting the Board (not the Special Committee) discussed at length Yucaipa's efforts to acquire a majority of the Obligations under the First Lien Credit Agreement.  Defendant Walker, a Yucaipa Director and Chairman of the Allied Board,  reported that Yucaipa was approached by a

"group of lenders" comprising 50.4% of the First Lien Term Loans who were interested in selling their loans to Yucaipa.

53.    Defendant Walker told the Board that Yucaipa was continuing to negotiate with the selling lenders and that the other First Lien Lenders would not be offered the opportunity to participate in the transaction. Walker told the Board that with the proposed transaction "there would be an amendment" to the First Lien Credit Facility which "would remove the existing restrictions on Yucaipa ownership of Allied to [sic] first lien debt."

54.    When Defendant Walker was asked Mr. Cullen to confirm that the First Lien Lenders did not want Yucaipa to purchase First Lien Debt, Defendant Walker evaded the question, responding only that "the lender restriction on Yucaipa purchasing first lien debt was contained only in the expired side letters." This was incorrect, as the restrictions were contained in the Third Amendment dated April 17, 2008. Defendant Walker also informed the Board that Yucaipa and the Debtors together "would likely issue a tender offer" to purchase First Lien Obligations of all First Lien Lenders, even though the Debtors had no funds with which to pay for any Obligations acquired.

55.    At that same meeting, the Board was also informed by certain of the Yucaipa Directors (Messrs. Walker, Tomczak and Gendregske) that it was their opinion that the actions of the Administrative Agent and other First Lien Lenders had the "clear intent" of driving Allied into liquidation. Based upon the information from the Yucaipa Directors, it appeared to the Board as "though CIT and the lenders were approaching consensus on exercising their rights."

56.    The Board was also informed by Mr. Walker that any debt acquired by Yucaipa would be held and not converted to equity. After a brief meeting of the Special

Committee, the Special Committee expressed the opinion that the transaction proposed by Yucaipa (i.e. the acquisition of a majority of the First Lien Obligations) "appeared allowable" and also "appeared to provide the only viable option to liquidation." Notably, the Board minutes contain no discussion of other strategic alternatives (including a possible debt for equity swap with the existing First Lien Lenders to restructure the Obligations), nor is there any indication that the Board received advice on restructuring alternatives from any investment banker or financial advisor. Rather, the only transaction the Board considered was the one presented by Yucaipa, based upon the opinions offered by the Yucaipa Directors.

57.    In February 2009, Yucaipa launched a tender offer to purchase from the First Lien Lenders at a substantial discount to par, Allied's Obligations under the First Lien Credit Agreement.[14] As a condition to any tender, the tendering First Lien Lender would have to execute an amendment to the First Lien Credit Agreement. The tender offer failed, and Yucaipa was left to implement its alternative strategy to become the Requisite Lender.

58.    After the failed tender offer, in an effort that Yucaipa admits was designed to frustrate the First Lien Lenders' rights under the First Lien Credit Agreement – in particular to prevent the First Lien Lenders from declaring the Obligations to be immediately due and payable and exercising their remedies – Yucaipa engineered a two-step hijacking of Allied's First Lien Credit Agreement.

59.    First, after ComVest's effort to facilitate a restructuring had been rebuffed for months by Yucaipa, the Yucaipa Directors and, upon information and belief, Burkle, Yucaipa and ComVest – who then held a majority of the Obligations under the First Lien Credit Agreement – entered into an Assignment and Assumption Agreement whereby Yucaipa agreed

---

[14] The proposed amendment was the same, in all material respect, as the document then later became the Purported Fourth Amendment.

to acquire the Obligations owned by ComVest for a combination of cash and future consideration (calculated as a percentage of Yucaipa's ultimate recovery on the Obligations purchased). That transaction, however, could not be consummated so long as the restrictions on Yucaipa's acquisition, ownership and voting of Obligations, as set forth in the Third Amendment, remained effective. So as a condition to consummation of the transaction with ComVest, Yucaipa required that an amendment to the First Lien Credit Agreement be entered into by Allied and ComVest eliminating these restrictions so that Yucaipa could become the Requisite Lender

60.    Thus, on August 21, 2009, Yucaipa caused Allied to enter into the Purported Fourth Amendment with ComVest. No First Lien Lender other than ComVest, whose interests were being bought out by Yucaipa for cash and future consideration rewarding ComVest for its role in the hijacking, consented to the Purported Fourth Amendment or was even solicited, even though stripping out the conditions and restrictions that prevented Yucaipa from becoming Requisite Lender clearly required the consent of all affected First Lien Lenders under the First Lien Credit Agreement.

61.    The sole purpose and effect of the Purported Fourth Amendment was to remove all of the restrictions imposed on Yucaipa's acquisition, ownership and voting of Obligations under the First Lien Credit Agreement (as amended through the Third Amendment), thereby for the first time making Yucaipa eligible to be a Requisite Lender. Yucaipa has admitted that it would not have purchased First Lien Debt unless the Fourth Amendment was enacted because the restrictions and conditions limiting Yucaipa's potential ownership rights would have prevented it from carrying out its scheme to control the entire capital structure.[15]

62.    Upon the execution and purported effectiveness of the Purported Fourth Amendment, Yucaipa and ComVest consummated the transactions contemplated by the

---

[15] [Yucaipa Answer and Counterclaims ¶50].

Assignment and Assumption Agreement.  As a result of that acquisition, and because of the purported removal of the restrictions on Yucaipa in the Purported Fourth Amendment, Yucaipa asserted that *it* was the Requisite Lender, with all of the attendant powers to enforce or refuse to enforce the First Lien Lenders' rights and remedies.

      63.    Beginning in August 2009 and continuing thereafter, Events of Default occurred under each of the Credit Agreements as the financial condition of the Debtors and their business operations continued to deteriorate.  In particular, the Debtors

(a)    Failed to make the payments of interest due to the First Lien Lenders on August 3, 2009 and on each Interest Payment Date thereafter through the date hereof;

(b)    Failed to make the payment of principal due to the First Lien Lenders on October 1, 2009 and on the first day of each calendar quarter thereafter;

(c)    Failed to make the payments of interest due to the Second Lien Lenders on August 17, 2009 and on each Interest Payment Date thereafter through the date hereof;

(d)    Failed to timely comply with their obligation to deliver certain annual financial statements, a Compliance Certificate and certain other materials for the Fiscal Years ended December 31, 2008 and December 31, 2009;

(e)    Failed to timely comply with their obligation to deliver a consolidated plan and financial forecast for the Fiscal Years ended December 31, 2009 and December 31, 2010;

(f)    Hoarded cash by maintaining excess cash balances in bank accounts not subject to any account control agreement;

(g)    Failed to timely comply with their obligation to pay promptly the attorneys' fees incurred by the First Lien Agent and First Lien Lenders in enforcing Obligations of and in collecting any payments due from a Credit Party under the First Lien Credit Agreement; and

(h)    Failed to comply with their obligations to reimburse LC Disbursements.

64.    Not surprisingly, once it began to assert the rights of the Requisite Lender, Yucaipa refused to allow the Administrative Agent to enforce any rights or take any actions on behalf of the First Lien Lenders despite the occurrence and continuance of Events of Default, including Events of Default resulting from the failure to make required payments of principal and interest.  Yucaipa prevented the Administrative Agent from taking any actions on behalf of the First Lien Lenders to accelerate the Obligations or exercise remedies, notwithstanding that Allied admitted its continuing Events of Default for more than three years, including the failure to pay millions of dollars of principal and interest on the Obligations to the detriment of all of Allied's non-insider First Lien Lenders.  With its dual control over both the Board and the First Lien Lenders, Yucaipa and the Yucaipa Directors were free to take whatever actions they deemed appropriate without fear of reprisal or repercussion, and without regard to the damage caused to Plaintiffs and the other First Lien Lenders.

65.    The Administrative Agent refused to acknowledge the validity of the Purported Fourth Amendment or Yucaipa's alleged status as Requisite Lender.  In response, on November 13, 2009, Yucaipa caused Allied (using the Debtors' assets to pay all the costs of the litigation) to commence an action on behalf of itself and Yucaipa against The CIT Group/Business Credit, Inc. ("CIT"), in the Superior Court of Fulton County, Georgia, *inter alia*, (a) alleging breach of the First Lien Credit Agreement, (b) seeking a declaration that the Purported Fourth Amendment was effective and binding on the parties to the First Lien Credit Agreement, and (c) seeking a declaration that Yucaipa was the Requisite Lender under the First Lien Credit Agreement (the "Georgia Action").

66.    Thereafter, on December 21, 2009, CIT filed a verified answer and counterclaims against Yucaipa and Allied seeking a declaration that the Purported Fourth

Amendment was ineffective and not binding, that Yucaipa was not the Requisite Lender, and other relief.

68. After more than two years of ruinously expensive litigation, on December 5, 2011, the parties to the Georgia Action entered into a settlement agreement pursuant to which CIT, in its individual capacity, capitulated and agreed not to "object to, challenge or contest, either directly or indirectly, the validity of the Fourth Amendment," and acknowledged "that Yucaipa is the Requisite Lender for all purposes including the exercise of remedies." Yucaipa also agreed to indemnify CIT "with respect to all claims, lawsuits, losses, damages or fees" arising out of, among other things, "CIT's express recognition herein of the validity and enforceability of the Fourth Amendment and the Yucaipa-ComVest Assignment Agreement."

68. After learning of the aforementioned Settlement of the Georgia Action and CIT's capitulation, Plaintiffs commenced the New York Action against Yucaipa on January 17, 2012 seeking a declaration that the Purported Fourth Amendment is invalid, ineffective and not binding, and that Yucaipa is not the Requisite Lender under the First Lien Credit Agreement.

69. In February and March 2012, the Plaintiffs urged the Board to engage in immediate discussions with Plaintiffs and/or other interested non-Yucaipa third parties regarding "an appropriate restructuring and/or recapitalization of the Borrowers and Subsidiary Guarantors to preserve and protect the Company's assets, and to maximize the value available to all interested parties." The Plaintiffs calls for negotiation were met with a terse refusal to engage in restructuring negotiations.

70. On May 17, 2012, the Petitioning Creditors filed involuntary petitions against Debtors. On June 10, 2012, Allied consented to orders for relief.

71.    Since the commencement of these chapter 11 cases, Yucaipa has continued to hold itself out as the Requisite Lender, and caused the Debtors to acknowledge their support for that position.

72.    On November 19, 2012, the court in the New York Action granted the Plaintiffs motion for summary judgment, declaring that Yucaipa is not and never was the "Requisite Lender."

**Yucaipa Controls the Debtors for Yucaipa's Benefit**

73.    Upon information and belief, in 2008, 2009 and 2010, the Debtors were presented with certain restructuring and/or sale alternatives ("Pre-Petition Transactions").

74.    These alternative proposals however, threatened Yucaipa's scheme to benefit itself and, upon information and belief, Burkle, to the detriment of the Debtor and the non-insider creditors.

75.    Yucaipa and the Yucaipa Directors, at the direction of Burkle, systematically maneuvered to impede any proposal that would result in sharing the benefits of the Pre-Petition Transactions with the Debtors or the Debtors' non-insider First lien Lender.

76.    Despite the Debtors' continuing Events of Default under the First Lien Credit Agreement, and deteriorating financial condition and business operations, Yucaipa, the Yucaipa Directors and, upon information and belief, Burkle, caused the Debtors not to pursue strategic alternatives for reorganization that would undercut Yucaipa's self-interest.

77.    In addition to the foregoing, Yucaipa and the Yucaipa Directors, intentionally caused the Debtors:

(a)    To pay millions of dollar of legal fees incurred by Yucaipa in the Georgia Action to Yucaipa's lawyers while in default under the First Lien Credit Agreement;

(b)    To fail to disclose such payments to or for the benefit of Yucaipa during the applicable period prior to the commencement of the cases;

(c)    To improperly assert positions in these chapter 11 cases supporting Yucaipa as Requisite Lender;

(d)    To promote a sale process in these bankruptcy cases solely for the benefit of Yucaipa which relied upon Yucaipa's illegitimate status as Requisite Lender ("Yucaipa Credit Bid"); and

(e)    To fail to pursue post-petition restructuring opportunities other than the Yucaipa Credit Bid;

78.    The Debtors and their creditors have been injured by the aforesaid intentional actions by Yucaipa, the Yucaipa Directors and Burkle.

## COUNT I

### AGAINST YUCAIPA
### FOR EQUITABLE SUBORDINATION PURSUANT TO 11 U.S.C. § 510(c)

79.    The Plaintiffs repeat and reallege each allegation contained in paragraphs __ through ____ above as if set forth fully herein.

80.    At all times relevant hereto, Yucaipa was an insider of the Debtor.

81.    As more fully described above, Yucaipa has engaged in unfair and inequitable conduct towards the Plaintiffs in that Yucaipa has manipulated the Debtors as an insider and in its capacity as alleged Requisite Lender and has engaged in overreaching with respect to the Debtors and their creditors by, among other things:

(a)    Yucaipa caused the Debtors to favor Yucaipa at the expense of other non-insider creditors.

(b)    Yucaipa caused the Debtors to abdicate their duty to maximize value, in favor of protecting Yucaipa's ownership position.

(c)    Yucaipa pressured Debtors' management repeatedly to defer to Yucaipa for the sole benefit of Yucaipa.

82.     Yucaipa's inequitable conduct has resulted in injury to the Plaintiffs by conferring unfair advantages upon Yucaipa in at least the following ways:

      (a)     Yucaipa caused the Debtors to adopt a business strategy to benefit Yucaipa at the expense of Plaintiffs.

      (b)     Yucaipa prevented the Debtors from developing restructuring proposals that maximize value Plaintiffs.

      (c)     Yucaipa forced the Debtors to place the interests of Yucaipa above the Debtors' own interests and those of the Plaintiffs, including but not limited to orchestrating amendments to the Credit Agreement solely for the benefit of Yucaipa.

83.     As a result of Yucaipa's conduct, Plaintiffs have been materially harmed.

84.     Granting the relief sought herein against Yucaipa is consistent with the Bankruptcy Code and is appropriate based on the indisputable facts of this case.

85.     Pursuant to 11 U.S.C. §510(c), all distributions to Yucaipa on account of its status as First Lien Lender and Second Lien Lender should be subordinated to the claims of all other creditors.

## COUNT II

## AGAINST YUCAIPA FOR SPECIFIC PERFORMANCE UNDER THE THIRD AMENDMENT TO THE FIRST LIEN CREDIT AGREEMENT

86.     The Plaintiffs repeat and reallege each allegation contained in paragraphs 1 through 85 above as if set forth fully herein.

87.     The Plaintiffs, Debtors and Yucaipa, as a Restricted Sponsor Affiliates, were parties to the Credit Agreement, a binding contractual agreement for valuable consideration.

88.     Yucaipa has breached the First Lien Credit Agreement by failing to make the capital contribution required under Section 10.6(j)(iii) of the First Lien Credit Agreement. Specifically,

"(j) <u>Restricted Sponsor Affiliates</u>. ...Each Lender that is a Restricted Sponsor Affiliate, upon succeeding to an interest in the Term Loans:

...

(iii) agrees further that no later than ten days after the date of such assignment or transfer of such Term Loans (or, if a Default or Event of Default occurs during such ten day period, then three Business Days after such Restricted Sponsor Affiliate has knowledge of the occurrence of such Default or Event of Default but in no event later than the last day of such ten day period), such Restricted Sponsor Affiliate shall make a capital contribution to Borrowers of no less than 50% of the aggregate principal amount of such Term Loans in accordance with Section 10.6(k);

89.    Yucaipa has breached the First Lien Credit Agreement by exceeding the maximum permissible limits under the First Lien Credit Agreement on the acquisition of Term Loan Exposure under Section 10.6(c) after given effect to the mandatory capital contribution in Section 10.6(j)(iii).  Specifically,

"provided further, that (x) no Lender may sell, assign, transfer or otherwise convey any of its rights and obligations under this Agreement (including the Commitments, the LC Deposits or the Loans) to a Restricted Sponsor Affiliate and no Restricted Sponsor Affiliate shall acquire any such rights or obligations, in each case if (A) immediately prior to and after giving effect to such assignment or transfer the aggregate amount of the Term Loan Exposure held or beneficially owned by all Restricted Sponsor Affiliates would exceed 25% of the aggregate principal amount of the Term Loan Exposure held or beneficially owned by all Lenders (including Restricted Sponsor Affiliates) or (B) after giving effect to such assignment or transfer, the aggregate amount of Term Loans acquired by all Restricted Sponsor Affiliates since the Closing Date would exceed $50 million (notwithstanding whether all or any portion of such acquired Term Loans have been contributed to Borrowers or otherwise disposed of by the Restricted Sponsor Affiliates) and (y) assignments by or to a Restricted Sponsor Affiliate shall be further subject to Section 10.6(j)."

90.    The Plaintiffs are not in violation of any provision of the First Lien Credit Agreement.  The Plaintiffs have performed or are prepared to perform all of their obligations under that contract.

91.    The First Lien Credit Agreement entitles the Plaintiffs as "Lenders" to specific performance pursuant to Section 10.6(j)(iv) .  Specifically,

"Each Restricted Sponsor Affiliate recognizes and acknowledges that a breach by it of any covenants or agreements contained in this Section 10.6(j) will cause the other Lenders and Agents to sustain damages for which it would not have an adequate

remedy at law for money damages, and therefore each Restricted Sponsor Affiliate agrees that in the event of any such breach, each of the other Lenders and Agents shall be entitled to specific performance of such covenants and agreements and injunctive and other equitable relief in addition to any other remedy to which it may be entitled, at law or in equity."

92.     The Plaintiffs are entitled to a decree of specific performance by Yucaipa of its obligations under the First Lien Credit Agreement.

## COUNT III

## AGAINST YUCAIPA FOR BREACH OF CONTRACT FOR MONEY DAMAGES UNDER NEW YORK LAW

93.     The Plaintiffs repeat and reallege each allegation contained in paragraphs 1 through 92 above as if set forth fully herein.

94.     The Plaintiffs, Debtors and Yucaipa, as a Restricted Sponsor Affiliates, were parties to the Credit Agreement, a binding contractual agreement for valuable consideration.

95.     Yucaipa has breached the First Lien Credit Agreement by failing to make the capital contribution required under Section 10.6(j)(iii) of the First Lien Credit Agreement. Specifically,

"(j) Restricted Sponsor Affiliates. …Each Lender that is a Restricted Sponsor Affiliate, upon succeeding to an interest in the Term Loans:

…

(iii) agrees further that no later than ten days after the date of such assignment or transfer of such Term Loans (or, if a Default or Event of Default occurs during such ten day period, then three Business Days after such Restricted Sponsor Affiliate has knowledge of the occurrence of such Default or Event of Default but in no event later than the last day of such ten day period), such Restricted Sponsor Affiliate shall make a capital contribution to Borrowers of no less than 50% of the aggregate principal amount of such Term Loans in accordance with Section 10.6(k);

96.    Yucaipa has breached the First Lien Credit Agreement by exceeding the maximum permissible limits under the First Lien Credit Agreement on the acquisition of Term Loan Exposure under Section 10.6(c). Specifically,

> "provided further, that (x) no Lender may sell, assign, transfer or otherwise convey any of its rights and obligations under this Agreement (including the Commitments, the LC Deposits or the Loans) to a Restricted Sponsor Affiliate and no Restricted Sponsor Affiliate shall acquire any such rights or obligations, in each case if (A) immediately prior to and after giving effect to such assignment or transfer the aggregate amount of the Term Loan Exposure held or beneficially owned by all Restricted Sponsor Affiliates would exceed 25% of the aggregate principal amount of the Term Loan Exposure held or beneficially owned by all Lenders (including Restricted Sponsor Affiliates) or (B) after giving effect to such assignment or transfer, the aggregate amount of Term Loans acquired by all Restricted Sponsor Affiliates since the Closing Date would exceed $50 million (notwithstanding whether all or any portion of such acquired Term Loans have been contributed to Borrowers or otherwise disposed of by the Restricted Sponsor Affiliates) and (y) assignments by or to a Restricted Sponsor Affiliate shall be further subject to Section 10.6(j)."

97.    The Plaintiffs are not in violation of any provision of the First Lien Credit Agreement. The Plaintiffs have performed or are prepared to perform all of their obligations under that contract.

98.    By reason of the foregoing, the Plaintiffs sustained monetary damages in in an amount to be proven at trial.

## COUNT IV

### AGAINST THE YUCAIPA DIRECTORS
### FOR BREACH OF FIDUCIARY DUTIES UNDER DELAWARE LAW

99.     The Plaintiffs repeat and reallege each allegation contained in paragraphs 1 through 98 above as if set forth fully herein.

100.     The Yucaipa Directors owed fiduciary duties of care and loyalty to the Debtor and its creditors because the Debtor has been insolvent since 2008.

101.     The fiduciary duties owed by the Yucaipa Directors to the creditors of the Debtors included, but were not limited to, the duty (i) to act in good faith; (ii) not to engage in any intentional misconduct or knowing violations of law, (iii) of undivided and unselfish loyalty to the Debtor and not to consider or represent interests other than those in the best interests of the Debtor, (iv) to preserve the assets of the Debtors for the benefit of its creditors, (v) to place the interests of the Debtors' non-insider creditors ahead of the interests of their equity holders and affiliates of their equity holders, including Yucaipa; and (vi) to place the interests of their non-insider creditors ahead of their own interests and the interests of the individual officers of the Debtors.

102.     The Yucaipa Directors' acts and omissions were not in good faith, and were each undertaken to further Yucaipa's financial interests.

103.     The Yucaipa Directors' interests were adverse to the interests of the Debtor and the Debtors' non-insider creditors, and their acts and omissions breached their duty of loyalty, and materially benefited the Yucaipa Directors, Yucaipa and Burkle.

104.     The Yucaipa Directors intentionally and willfully breached their duty to evaluate and effectuate a potential restructuring, sale or other strategic alternatives available to the Debtors.

105.     Through these acts and omissions, the Yucaipa Directors intentionally and willfully failed to act in good faith and with care and loyalty to the Debtors and all of the Debtors' non-insider creditors, and engaged in a dereliction of their fiduciary duties.

106.     As a result of these acts and omissions, the Yucaipa Directors caused direct injury and damages to the Debtors for which the Yucaipa Directors are liable.

107.     The Debtor and its estate are entitled to damages from the Yucaipa Directors for their breaches of their fiduciary duties.

## COUNT V

### AGAINST BURKLE AND YUCAIPA
### FOR AIDING AND ABETTING BREACH OF FIDUCIARY DUTIES
### UNDER DELAWARE LAW

108.     The Plaintiffs repeat and reallege each allegation contained in paragraphs 1 through 107 above as if set forth fully herein.

109.     The Yucaipa Directors owed fiduciary duties of care and loyalty to the Debtors and their creditors because the Debtors have been insolvent since 2008.

110.     Upon information and belief, Defendant Burkle, as founder and Managing Partner of The Yucaipa Companies LLC, directed and controlled the actions of Yucaipa and the Yucaipa Directors.

111.     The Yucaipa Directors breached their fiduciary duties of care and loyalty.

112.     Defendants Burkle and Yucaipa knowingly participated in and induced the breaches of the fiduciary duties of loyalty and care owed by the Yucaipa Directors to the Debtors, and such breaches were on account of, or for the direct benefit of Defendants Burkle and Yucaipa.

113.     Upon information and belief, Defendant Burkle used his dominion and control of Yucaipa to knowingly induce the Yucaipa Directors, among other things, (i) to usurp

an opportunity with a potential strategic buyer in an effort to allow Yucaipa to recover more on its Obligations it allegedly owned under the First Lien Credit Agreement, (ii) to direct the Yucaipa Directors to not pursue restructuring opportunities despite Events of Default under the First Lien Credit Agreement, and (iii) to cause the Yucaipa Directors to force Allied to enter into the Purported Fourth Amendment.

114.    Defendants Burkle and Yucaipa knew of the Yucaipa Directors' breaches, and not only failed to take any action to stop them, but instead took advantage of the Yucaipa Directors' breaches of the fiduciary duties of care and loyalty for the benefit of Defendants Burkle and Yucaipa.  As a result, Burkle and Yucaipa induced the Yucaipa Directors to use millions of dollars of the Debtors' assets to defend Yucaipa's control of the Debtors.  Such actions by Defendants Burkle and Yucaipa proximately caused damages to the Debtor and its creditors, including Plaintiffs, for which Defendants Burkle and Yucaipa are liable.

## RELIEF SOUGHT

**WHEREFORE,** by reason of the foregoing, the Plaintiffs request that the Court grant the following relief:

A.    enter judgment against Yucaipa finding that it engaged in inequitable conduct pursuant to 11 U.S.C. §510(c);

B.    subordinate all Yucaipa claims to the claims of all other creditors; and

C.    decree specific performance of Yucaipa's obligations under the First Lien Credit Agreement under Court II of this Complaint;

D.    award money damages against Yucaipa and in favor of the Plaintiffs under Count III of this Complaint in an amount to be determined at trial; and

E.    enter judgment against the Yucaipa Directors, jointly and severally, and in favor of the Plaintiffs under Count IV of this Complaint for damages,

attorneys' fees and costs and such other amounts as to be determined at trial; and

F.     enter judgment against Burkle and Yucaipa and in favor of the Plaintiffs under Count V of this Complaint for damages, attorneys' fees and costs and such other amounts as to be determined at trial; and

G.     grant the Plaintiffs such other and further relief as this Court deems equitable and just.

Dated:  January 25, 2013
        Wilmington, Delaware

        LANDIS RATH & COBB LLP

        Adam G. Landis (No. 3407)
        Kerri K. Mumford (No. 4186)
        919 Market Street, Suite 1800
        Wilmington, Delaware 19801
        Telephone: (302) 467-4400
        Facsimile: (302) 467-4500

        —and—

        Adam C. Harris
        Robert J. Ward
        SCHULTE ROTH & ZABEL LLP
        919 Third Avenue
        New York, New York 10022
        Telephone: (212) 756-2000
        Facsimile: (212) 593-5955

        *Attorneys for Plaintiffs BDCM Opportunity Fund II,
        LP, Black Diamond CLO 2005-1 Ltd, and
        Spectrum Investment Partners, L.P.*

{935.001-W0024534.}